IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 24, 2002 Session

**THOMAS J. MCKEE v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Knox County**
**No. 69610     Richard R. Baumgartner, Judge**

---

**No. E2002-00071-CCA-R3-PC**
**March 13, 2003**

---

The petitioner, Thomas J. McKee, appeals the Knox County Criminal Court's denial of his petition for post-conviction relief from his conviction for first degree premeditated murder and resulting life sentence.  He contends that he received the ineffective assistance of counsel because his trial attorney failed (1) to request a mental evaluation for him; (2) to make a contemporaneous objection to the state's improper closing argument; and (3) to object to the inclusion of the phrase "moral certainty" in the jury's instruction on reasonable doubt.  We affirm the trial court's denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which DAVID H. WELLES and ALAN E. GLENN, JJ., joined.

Kelly S. Johnson, Knoxville, Tennessee, for the appellant, Thomas J. McKee.

Paul G. Summers, Attorney General and Reporter; Angele M. Gregory, Assistant Attorney General; Randall E. Nichols, District Attorney General; and G. Scott Green, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the petitioner's killing his estranged wife in 1994.  A jury convicted the petitioner, and this court affirmed the conviction.  See State v. Thomas J. McKee, No. 03C01-9603-CR-00092, Knox County (Tenn. Crim. App. Apr. 28, 1998), app. denied (Tenn. Dec. 28, 1998).  On appeal, this court stated the following facts:

> According to Donnie Arden, a family friend of the McKee's, the defendant's wife was playing a "mind game" with her husband, repeatedly calling and telling him that she loved him, then calling back and telling him that she hated him.  Arden heard some of these messages on the defendant's answering machine.

. . . .

At about l0:30 a.m. on September 21, 1994, the defendant was at work when he received a message on his beeper. He left work and went to the nearest phone, returning twenty to thirty minutes later. He told co-workers that he had talked to his estranged wife on the phone, that he was going to meet with her, and that there was a chance they might reconcile. He picked up his carpenter's tools, put them in his car, and left work, saying that he would meet with her even if it cost him his job.

September 21st was the couple's wedding anniversary. Motel records revealed that on that day the defendant, accompanied by another person, rented and occupied a room at the Clark Motel in north Knoxville.

At 2:12 p.m. that day, Knox County Sheriff's deputies were called to Brushy Valley Road, a country road next to a field bordered by a barbed-wire fence, where the victim was found lying dead. She had sustained multiple blows to her head and numerous scratches that appeared to have been caused by the barbed wire.

A witness had seen a red sporty car speeding away from the area shortly before the body was found. There is no evidence that the killing occurred in the car or in the motel.

At 2:30 p.m. that afternoon, while investigators were still at the crime scene, Arden saw and talked with the defendant at his father's home. The defendant, who had a beard, was shaving. The defendant said "he had [f*****] up, [f*****] up big time." When Arden asked him to explain, the defendant said he had killed Marilyn. When Arden asked if he was sure she was dead, the defendant said "yes, she ought to be." Arden testified that the defendant said his wife had called him that morning and they had agreed to meet. The defendant also said they had gone to a motel and made love. Later that afternoon, the defendant had asked his wife to move back in with him and she had refused. The defendant said she told him that she was living with another man and "that's when it [the killing] happened." Arden testified that the defendant said the victim had told him she loved him as they drove to the motel.

The defendant had asked Arden to take the license plate off his red Camaro and hide the car, which Arden did. But when the

defendant asked Arden to provide him with an alibi for the time of the killing, Arden refused and told him to turn himself in. The defendant answered that he needed to talk to a lawyer.

The defendant's red Camaro was found where Arden had put it. An unsigned anniversary card, which read "For My Wonderful Wife . . .,"was found inside the car, and the defendant's carpentry tools were found in the back seat. . . .

Id., slip op. at 3.

At the evidentiary hearing, the petitioner testified that at the time of his trial, he was twenty-seven years old and had no experience with jury trials. He said that he trusted his attorney and that they got along well. He said his attorney told him first degree murder required premeditation and deliberation but did not explain the importance of his state of mind at the time of the killing. He said that he and his attorney talked about getting a psychological evaluation for him but that his attorney was afraid the state would use any damaging information revealed in the evaluation against him at trial. He said that he thought his attorney knew best and that he left the decision about a psychological evaluation to his attorney. He said that about a month before the evidentiary hearing, he received a psychological evaluation from Dr. Peter Young.

On cross-examination, the petitioner testified that before Dr. Young, he had never met with a psychologist or a psychiatrist. He said that his attorney should have requested a psychological evaluation for him in order to determine what his state of mind was at the time of the killing. He said that he was not thinking when he killed his wife and that he "just snapped." He said he was scared when he talked to Donnie Arden after the killing because he knew he had made a mistake. He acknowledged that his actions after he killed his wife showed that he was thinking and planning after the crime. He acknowledged that he appears normal and that nothing would indicate to a person that he needs a psychological evaluation. He also acknowledged that his attorney "put his heart" into arguing the petitioner's case and that the Public Defender sat at the defense table at trial and assisted his attorney.

Psychologist Peter Young testified that he met with the petitioner about one month before the evidentiary hearing. He said that based on his interview with the petitioner, his review of the petitioner's trial transcript, and his review of the appellate decision filed by the Court of Criminal Appeals, he completed a neuropsychological evaluation of the petitioner. He said the petitioner had average intelligence but appeared to have some weaknesses in language and in apprehending social cues. He said that the petitioner also appeared to have weaknesses in the right frontal hemisphere of his brain and that such weaknesses could result in a person having problems regulating his or her behavior. He said that in his report, he stated that the petitioner had a strong tendency to act impulsively and had trouble planning ahead. He said that the petitioner had numerous emotional difficulties and that he did not believe the petitioner premeditated killing the victim. He said that although he met with the petitioner seven years after the petitioner's trial, the results of his

evaluation would have been similar to results from a 1995 evaluation because "who we are stays relatively stable over time."

On cross-examination, Dr. Young testified that he had completed about two thousand neuropsychological evaluations and that he spent about fifteen hours with the petitioner. He acknowledged that the petitioner had no outward manifestations that would indicate the petitioner had mental problems. He said that the petitioner was depressed, anxious, and may have a personality disorder. He said that although the petitioner told the victim several months before the crime that he was going to kill her, such statements were not indicative of the petitioner's intent at the time of the killing because the petitioner may have made the statements impulsively. He said the fact that the petitioner went to a motel with the victim and had sex with her indicated that the petitioner had not planned to kill the victim at that point. He acknowledged that the petitioner's actions after the killing showed that the petitioner was able to think and plan.

Attorney Brandt Davis testified that he practiced criminal law in Knox County. He said he had reviewed the motions filed in the petitioner's case, the appellate record, the opinion filed by the Court of Criminal Appeals, and Dr. Peter Young's report. He said that in a first degree murder case, he would consider an attorney's failure to seek a psychological evaluation for a defendant to be ineffective assistance of counsel. He said that since 1995, he had handled about thirteen first degree murder cases and that he had always requested psychological evaluations for the defendants. He said that if the sole issue in a case is the defendant's state of mind at the time of the killing, then an attorney should get a mental evaluation for the defendant. He said that in the petitioner's case, he would not have hesitated to ask the trial court for an evaluation because the facts did not indicate the petitioner premeditated the killing. He said that the petitioner's attorney could have filed a sealed, ex parte motion requesting the evaluation. He said that if the psychological evaluation revealed damaging information about the petitioner, then the defense did not have to use the evaluation at trial.

On cross-examination, Mr. Davis acknowledged that the petitioner's attorney took steps to ensure that the trial court properly instructed the jury that it could not consider the petitioner's actions after the crime as evidence of premeditation. He also acknowledged that he did not think the prosecutor's improper statements during closing argument affected the jury's verdict. He said that he would have sought a psychological evaluation for the petitioner because such an evaluation was the only way to show that the petitioner did not premeditate or deliberate killing the victim. He acknowledged that the petitioner's attorney was a good lawyer.

The petitioner's trial attorney testified that at the time of the hearing, he had been an attorney with the Public Defender's Office for eleven years and had tried many criminal cases. He said that he spent about fifteen hours with the petitioner before trial and that they talked about the petitioner's social history and the facts of the case. He said that the petitioner acknowledged killing the victim and was remorseful. He said that he and the petitioner decided to mitigate the level of the offense rather than avoid responsibility for the crime. He said that he and the petitioner talked about getting a mental evaluation for the petitioner and that he told the petitioner the report could reveal damaging

evidence for the defense. He said, though, that he knew he did not have to use the evaluation at trial. He said that even if he had tried to get an evaluation for the petitioner, he would have had trouble showing a particularized need for it because the petitioner never indicated he had a mental disease or infirmity and because the petitioner appeared to have average intelligence. He said that the petitioner had two prior convictions for assaulting the victim and that he was able to keep the jury from hearing about those convictions.

On cross-examination, the petitioner's trial attorney acknowledged that he had no formal training in psychiatry, and he said that he had never tried a first degree murder case before the petitioner's case. He acknowledged that the main issue at trial was the petitioner's state of mind at the time of the killing, and he said he believed that the petitioner was guilty only of second degree murder. He said that he was afraid a psychological evaluation would reveal facts about the petitioner's prior acts of violence and verbal threats against the victim. He said that although the petitioner did not receive a mental evaluation, the defense presented evidence about the petitioner's state of mind through Donnie Arden, who testified that the victim played mind games with the petitioner and that the petitioner killed the victim when the victim told the petitioner she was living with another man. He said that evidence about the petitioner signing his name and putting his license tag on the hotel registry also showed that the petitioner did not plan to kill the victim. He said that during closing arguments, the prosecutor told the jury that it could consider the petitioner's concealment of the crime as evidence that the petitioner premeditated and deliberated killing the victim. He said that although he knew that was not the law in Tennessee, he did not make a contemporaneous objection. He said, though, that he objected at the end of the state's closing argument and that the trial court later instructed the jury that it could not consider concealment of evidence as proof of premeditation.

The trial court denied the petition for post-conviction relief. The trial court stated that it did not understand why the petitioner's trial attorney did not request a mental evaluation for the petitioner. However, it also stated that it was not convinced it would have granted such a request. In addition, the trial court determined that Peter Young's psychological evaluation was of "marginal benefit" to the petitioner because Dr. Young's "major diagnosis of Mr. McKee is that he suffers from depression." The trial court noted that while Dr. Young believed the petitioner had some mental deficiencies, Dr. Young also believed that the deficiencies were not pronounced and that the petitioner had average intelligence. Finally, the trial court determined that the defense would have made a tactical decision not to use the evaluation at trial because the defense did not want to open the door to the petitioner's prior threats and violent acts against the victim. The trial court noted that the defense presented evidence about the victim's playing mind games with the petitioner and ruled that the petitioner's attorney was not ineffective for failing to request a mental evaluation. As to the petitioner's argument that his attorney was ineffective for failing to object to the prosecutor improperly arguing during closing statements that evidence of the petitioner's concealing the crime showed premeditation, the trial court stated that it instructed the jury that evidence of concealment proved nothing about the petitioner's state of mind at the time of the killing. Therefore, it determined that the petitioner could not demonstrate that he was prejudiced by his attorney's failure to make a contemporaneous objection. Finally, as to the petitioner's claim that the trial court

improperly instructed the jury on "moral certainty" in the reasonable doubt instruction, the trial court held that its reasonable doubt instruction was proper.

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial in terms of rendering a reasonable probability that the result of the trial was unreliable or the proceedings fundamentally unfair. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72, 113 S. Ct. 838, 842-44 (1993). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065; see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance. Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. See Hellard, 629 S.W.2d at 9; DeCoster, 487 F.2d at 1201.

In a post-conviction case, the burden is on the petitioner to prove by clear and convincing evidence his grounds for relief. Tenn. Code Ann. § 40-30-210(f). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

### I. MENTAL EVALUATION

The petitioner claims that he received the ineffective assistance of counsel because his trial attorney failed to request a mental evaluation for him. He argues that an evaluation was necessary in this case because the main issue at trial was his state of mind at the time of the killing. He contends that his attorney should have recognized the need for an evaluation when he admitted killing the victim. In addition, he contends that his attorney's fear that the evaluation would reveal damaging information for the defense was no excuse for failing to request an evaluation because the defense was not obligated to use the evaluation at trial. The state claims that the attorney's failure to request a mental evaluation was a well-considered tactical decision that should not be second

guessed by this court. Moreover, the state claims that the attorney was not deficient for failing to request an evaluation because the petitioner did not indicate that he had any mental illness or deficiency. We conclude that the petitioner is not entitled to relief.

Initially, we note that we are not in a position to say that an attorney should request a mental evaluation for a defendant in every first degree murder case. That said, we cannot conclude that the petitioner's attorney rendered deficient performance by failing to request an evaluation. The petitioner's attorney testified that he spent about fifteen hours with the petitioner and that he saw no indications the petitioner had a mental disease or infirmity. He also said that the petitioner had average intelligence and that he thought he would have trouble showing a particularized need for a mental evaluation. In denying post-conviction relief, the trial court stated that even if the attorney had requested an evaluation, it was unconvinced that it would have granted the request. Therefore, given the facts and circumstances of this case, the petitioner has failed to demonstrate that his attorney rendered deficient performance.

We also believe that the petitioner has failed to demonstrate that he was prejudiced by his attorney's failing to request an evaluation. In State v. Hall, 958 S.W.2d 679 (Tenn. 1997), our supreme court held that an expert's testimony regarding a defendant's psychological condition may be admissible if it tends to prove or disprove that the defendant did not have the capacity to form the required mental state. However, in order to be admissible, "the psychiatric testimony must demonstrate that the defendant's inability to form the requisite culpable mental state was the product of a mental disease or defect, not just a particular emotional state or mental condition." Id. at 690.

Dr. Young never testified or stated in his report that the petitioner had a mental disease or defect that made him unable to premeditate or deliberate killing the victim. Instead, he testified that the petitioner suffers from depression, tends to act impulsively, has emotional difficulties, and may have a personality disorder. Moreover, in his report, Dr. Young stated that the petitioner's "difficulties in regulating his emotions, in anticipating future events, and, in general, in coping with the complexities of life are much more consistent with his acting impulsively in and around the murder than with he having planned and then carried out the murder of his wife." As explained by the supreme court, "[Expert] opinion testimony about the typical reactions of certain personality types is not relevant to the capacity of the particular defendant on trial." Id. at 691. Therefore, in light of Hall, even if the petitioner's trial attorney had requested an evaluation and the trial court had granted the request, we cannot conclude that the results of the evaluation would have been admissible. The petitioner has failed to show that he received the ineffective assistance of counsel.

## II. CLOSING ARGUMENT

Next, the petitioner claims that he received the ineffective assistance of counsel because his attorney failed to make a contemporaneous objection when the prosecutor argued during closing statements that the jury could consider the petitioner's concealing the crime as evidence of premeditation. In support of his claim, he cites the opinion in his direct appeal in which this court determined that although the prosecutor's argument was improper, the attorney's failure to make a

contemporaneous objection waived the issue. The state concedes that the prosecutor's statements were improper. However, it contends that the petitioner cannot demonstrate prejudice because the trial court properly instructed the jury not to consider the petitioner's actions after the killing as proof of his state of mind at the time of the crime. We agree with the state.

We observe that the petitioner has not made the trial transcript containing the parties' closing arguments or the jury instructions part of the post-conviction record. However, we may take judicial notice of the record in the appeal of the petitioner's conviction. See State ex rel. Wilkerson v. Bomar, 213 Tenn. 499, 505, 376 S.W.2d 451, 453 (1964). The record reveals that during the state's closing argument, the prosecutor told the jury that the petitioner's fleeing the scene of the crime, disposing of the murder weapon, shaving his beard, and asking Donnie Arden to provide him with an alibi were proof of premeditation. After the state finished its closing argument, the defense asked the trial court to instruct the jury that it could not consider the petitioner's actions after the crime as proof of premeditation. During the jury instructions, the trial court stated the following:

> The concealment of evidence may itself be evidence of guilt. The concealment of evidence, however, may be associated with the commission of the crime and the accompanying fear of punishment. One who kills another in a passionate rage may dispose of the weapon when reason returns just as readily as the cool dispassionate killer. The fact that evidence is subsequently hidden from the police reveals nothing about a criminal's state of mind before the crime.

We question whether the attorney's failure to make a contemporaneous objection resulted in his rendering deficient performance. In any event, we agree with the trial court that the petitioner has failed to demonstrate prejudice. The trial court instructed the jury that it could not consider the petitioner's post-crime actions as evidence of premeditation. Moreover, in the petitioner's direct appeal, this court stated that "the failure of the defendant to enter a contemporaneous objection to the argument and the instruction of the trial court on the law . . . diffused any taint created by such argument." Thomas J. McKee, slip op. at 6.

### III. REASONABLE DOUBT INSTRUCTION

Finally, the petitioner claims that he received the ineffective assistance of counsel because his trial attorney failed to object when the trial court gave the following instruction to the jury:

> Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily as to the certainty of guilt. Reasonable doubt does not mean a captious, possible or imaginary doubt. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required, and this certainty

is required as to every proposition of proof requisite to constitute the offense.

He contends that his attorney should have objected to the use of the term "moral certainty" because it allowed the jury to convict him based on a lower standard of proof than is constitutionally required. However, the courts of this state have repeatedly upheld the use of the phrase "moral certainty" in the context of the reasonable doubt jury instruction given at the petitioner's trial. See Nichols v. State, 877 S.W.2d 722, 734 (Tenn. 1994); State v. Sexton, 917 S.W.2d 263, 266 (Tenn. Crim. App. 1995); Pettyjohn v. State, 885 S.W.2d 364, 366 (Tenn. Crim. App. 1994); see also Austin v. Bell, 126 F.3d 843, 846-47 (6th Cir. 1997). Thus, the petitioner's attorney was not deficient for failing to object to the instruction, and the petitioner is not entitled to relief.

Based on the foregoing and the record as a whole, we affirm the trial court's denial of the petition for post-conviction relief.

_____
JOSEPH M. TIPTON, JUDGE